United States Court of Appeals,

Eleventh Circuit.

No. 94-4745.

David G. EPSTEIN, Plaintiff-Appellant,

v.

The OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OF the ESTATE OF PIPER AIRCRAFT CORPORATION, Piper Aircraft Corporation, Defendants-Appellees,

Pilatus Aircraft Limited, Amicus.

In re PIPER AIRCRAFT, CORP., Debtor.

July 26, 1995.

Appeal from the United States District Court for the Southern District of Florida. (No. 94-8044-CIV-SMA), Sidney M. Aronovitz, Judge.

Before DUBINA and BLACK, Circuit Judges, and MORGAN, Senior Circuit Judge.

BLACK, Circuit Judge:

This is an appeal by David G. Epstein, as the Legal Representative for the Piper future claimants (Future Claimants), from the district court's order of June 6, 1994, affirming the order of the bankruptcy court entered on December 6, 1993. The sole issue on appeal is whether the class of Future Claimants, as defined by the bankruptcy court, holds claims against the estate of Piper Aircraft Corporation (Piper), within the meaning of § 101(5) of the Bankruptcy Code. After review of the relevant provisions, policies and goals of the Bankruptcy Code and the applicable case law, we hold that the Future Claimants do not have claims as defined by § 101(5) and thus affirm the opinion of the district court.

I. FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural history of this appeal is fully set forth in the bankruptcy court's Memorandum Opinion, *see In re: Piper Aircraft Corp.,* 162 B.R. 619 (Bankr.S.D.Fla.1994), and the district court's Order Affirming Decision of the Bankruptcy Court, *see In re: Piper Aircraft Corp.,* 168 B.R. 434 (S.D.Fla.1994) (Piper II), and therefore need not be repeated here in its entirety. For purposes of this appeal, the relevant facts are as follows.

Piper has been manufacturing and distributing general aviation aircraft and spare parts throughout the United States and abroad since 1937. Approximately 50,000 to 60,000 Piper aircraft still are operational in the United States. Although Piper has been a named defendant in several lawsuits based on its manufacture, design, sale, distribution and support of its aircraft and parts, it has never acknowledged that its products are harmful or defective.[1]

On July 1, 1991, Piper filed a voluntary petition under Chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. Piper's plan of reorganization contemplated finding a purchaser of substantially all of its assets or obtaining investments from outside sources, with the proceeds of such transactions serving to fund distributions to creditors. On April 8, 1993, Piper and Pilatus Aircraft Limited signed a letter of intent pursuant to which Pilatus would purchase Piper's assets. The letter of intent

---

[1]Piper made a decision in 1987 to self-insure and therefore does not have any product liability insurance covering events or occurrences taking place after that year.

required Piper to seek the appointment of a legal representative to represent the interests of future claimants by arranging a set-aside of monies generated by the sale to pay off future product liability claims.

On May 19, 1993, the bankruptcy court appointed Appellant Epstein as the legal representative for the Future Claimants. The Court defined the class of Future Claimants to include:

> All persons, whether known or unknown, born or unborn, who may, after the date of confirmation of Piper's Chapter 11 plan of reorganization, assert a claim or claims for personal injury, property damages, wrongful death, damages, contribution and/or indemnification, based in whole or in part upon events occurring or arising after the Confirmation Date, including claims based on the law of product liability, against Piper or its successor arising out of or relating to aircraft or parts manufactured and sold, designed, distributed or supported by Piper prior to the Confirmation Date.

*See* Order, May 19, 1993 (Mark, J.). This Order expressly stated that the court was making no finding on whether the Future Claimants could hold claims against Piper under § 101(5) of the Code.

On July 12, 1993, Epstein filed a proof of claim on behalf of the Future Claimants in the approximate amount of $100,000,000. The claim was based on statistical assumptions regarding the number of persons likely to suffer, after the confirmation of a reorganization plan, personal injury or property damage caused by Piper's pre-confirmation manufacture, sale, design, distribution or support of aircraft and spare parts. The Official Committee of Unsecured Creditors (Official Committee), and later Piper, objected to the claim on the ground that the Future Claimants do not hold § 101(5) claims against Piper. After a hearing on the objection, the bankruptcy court agreed that the Future Claimants did not hold §

101(5) claims, and, on December 6, 1993, entered an Order Sustaining the Committee's Objection and Disallowing the Legal Representative's Proof of Claim. In a Memorandum Opinion dated January 14, 1994, that court entered final findings of fact and conclusions of law to support its December Order. Epstein, as Legal Representative, then appealed from the bankruptcy court's order. On June 6, 1994, the district court affirmed and accepted the decision of the bankruptcy court. Epstein now appeals from the district court's order, challenging in particular its use of the prepetition relationship test to define the scope of a claim under § 101(5).

## II. DISCUSSION

The sole issue on appeal, whether any of the Future Claimants hold claims against Piper as defined in § 101(5) of the Bankruptcy Code, is one of first impression in this Circuit. Interpretation and application of the Bankruptcy Code is a question of law, to which this Court will apply a *de novo* standard of review. *In re: James Cable Partners, L.P.,* 27 F.3d 534, 536 (11th Cir.1994).

A. *Statute*

Under the Bankruptcy Code, only parties that hold preconfirmation claims have a legal right to participate in a Chapter 11 bankruptcy case and share in payments pursuant to a Chapter 11 plan. 11 U.S.C.A. §§ 101(10), 501, 502 (West 1993). In order to determine if the Future Claimants have such a right to participate, we first must address the statutory definition of the term "claim." The Bankruptcy Code defines claim as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;  or

(B)  right  to  an  equitable  remedy  for  breach  of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.A. § 101(5).  The legislative history of the Code suggests that Congress intended to define the term claim very broadly under § 101(5), so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."  H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266.  *See In re:  St. Laurent II,*  991 F.2d 672, 678 (11th Cir.1993) (stating that "[t]he legislative history of the Bankruptcy Code indicates that "claim' was to be given the "broadest possible definition' ").

B. *Case Law*

Since  the  enactment  of  § 101(5),  courts  have  developed several  tests  to  determine  whether  certain  parties  hold  claims pursuant to that section:  the accrued state law claim test,[2] the conduct  test,  and  the  prepetition  relationship  test.  The

---

[2]The accrued state law claim theory states that there is no claim for bankruptcy purposes until a claim has accrued under state law.  The most notable case adopting this approach is the Third Circuit's decision in *In re:  M. Frenville Co.,* 744 F.2d 332 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).  This test since has been rejected by a majority of courts as imposing too narrow an interpretation on the term claim. *See e.g., Grady v. A.H. Robins Co.,* 839 F.2d 198, 201 (4th Cir.), *cert. denied,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988);  *In re:  Black,* 70 B.R. 645 (Bankr.D.Utah 1986);  *Acevedo v. Van Dorn Plastic Machinery Co.,* 68 B.R. 495 (Bankr.E.D.N.Y.1986);  *In re:  Edge,* 60 B.R. 690 (Bankr.M.D.Tenn.1986);  *In re:  Johns-Manville Corp.,* 57 B.R. 680 (Bankr.S.D.N.Y.1986);  *In re:  Yanks,* 49 B.R. 56 (Bankr.S.D.Fla.1985).  We agree with these courts and decline to employ the state law claim theory.

bankruptcy court and district court adopted the prepetition relationship test in determining that the Future Claimants did not hold claims pursuant to § 101(5).

Epstein primarily challenges the district court's application of the prepetition relationship test. He argues that the conduct test, which some courts have adopted in mass tort cases,[3] is more consistent with the text, history, and policies of the Code. [4] Under the conduct test, a right to payment arises when the conduct giving rise to the alleged liability occurred. *See A.H. Robins,* 839 F.2d at 199; *Waterman,* 141 B.R. at 556. Epstein's position is that any right to payment arising out of the prepetition conduct of Piper, no matter how remote, should be deemed a claim and provided for, pursuant to § 101(5), in this case. He argues that the relevant conduct giving rise to the alleged liability was Piper's prepetition manufacture, design, sale and distribution of allegedly defective aircraft. Specifically, he contends that, because Piper performed these acts prepetition, the potential victims, although not yet identifiable, hold claims under § 101(5) of the Code.

---

[3]*See, e.g., A.H. Robins Co.,* 839 F.2d at 203 (Dalkon Shield); *In re: Waterman Steamship Corp.,* 141 B.R. 552, 556 (Bankr.S.D.N.Y.1992) (asbestos), *vacated on other grounds,* 157 B.R. 220 (Bankr.S.D.N.Y.1993); *In re: Johns-Manville Corp.,* 36 B.R. 743, 750 (Bankr.S.D.N.Y.1984) (asbestos).

[4]Epstein claims that the prepetition relationship test, by requiring identifiability of claimants, eliminates the words "contingent," "unmatured," "unliquidated," and "disputed" from the statute. He further argues that requiring a prepetition relationship is contrary to the Congressional objective that bankruptcy permit a complete settlement of the affairs of the debtor and a complete discharge and fresh start, as the claims of those persons whose injuries become manifest after the petition is filed could prove a drain on the reorganized debtor's assets for years to come.

The Official Committee and Piper dispute the breadth of the definition of claim asserted by Epstein, arguing that the scope of claim cannot extend so far as to include unidentified, and presently unidentifiable, individuals with no discernible prepetition relationship to Piper. Recognizing, as Appellees do, that the conduct test may define claim too broadly in certain circumstances, several courts have recognized "claims" only for those individuals with some type of prepetition relationship with the debtor. *See In re: Jensen,* 995 F.2d 925, 929-31 (9th Cir.1993); *In re: Chateaugay Corp.,* 944 F.2d 997, 1003-04 (2d Cir.1991); *In re: Correct Mfg. Corp.,* 167 B.R. 458, 459 (Bankr.S.D.Ohio 1994). The prepetition relationship test, as adopted by the bankruptcy court and district court, requires "some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant" in order for the claimant to hold a § 101(5) claim. *In re: Piper,* 162 B.R. at 627; *Piper II,* 168 B.R. at 440.

Upon examination of the various theories, we agree with Appellees that the district court utilized the proper test in deciding that the Future Claimants did not hold a claim under § 101(5). Epstein's interpretation of "claim" and application of the conduct test would enable anyone to hold a claim against Piper by virtue of their potential future exposure to any aircraft in the existing fleet. Even the conduct test cases, on which Epstein relies, do not compel the result he seeks. In fact, the conduct test cases recognize that focusing solely on prepetition conduct, as Epstein espouses, would stretch the scope of § 101(5).

Accordingly, the courts applying the conduct test also presume some prepetition relationship between the debtor's conduct and the claimant. *See A.H. Robins,* 839 F.2d at 203; *Waterman,* 141 B.R. at 556.

While acknowledging that the district court's test is more consistent with the purposes of the Bankruptcy Code than is the conduct test supported by Epstein, we find that the test as set forth by the district court unnecessarily restricts the class of claimants to those who could be identified prior to the filing of the petition. Those claimants having contact with the debtor's product post-petition but prior to confirmation also could be identified, during the course of the bankruptcy proceeding, as potential victims, who might have claims arising out of debtor's prepetition conduct.

We therefore modify the test used by the district court and adopt what we will call the "Piper test" in determining the scope of the term claim under § 101(5): an individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product. The debtor's prepetition conduct gives rise to a claim to be administered in a case only if there is a relationship established before confirmation between an identifiable claimant or group of claimants and that prepetition

conduct.[5]

In the instant case, it is clear that the Future Claimants fail the minimum requirements of the Piper test. There is no preconfirmation exposure to a specific identifiable defective product or any other preconfirmation relationship between Piper and the broadly defined class of Future Claimants. As there is no preconfirmation connection established between Piper and the Future Claimants, the Future Claimants do not hold a § 101(5) claim arising out of Piper's prepetition design, manufacture, sale, and distribution of allegedly defective aircraft.

## III. CONCLUSION

For the foregoing reasons, we hold that the Future Claimants do not meet the threshold requirements of the Piper test and, as a result, do not hold claims as defined in § 101(5) of the Bankruptcy Code.

AFFIRMED.

---

[5]This modified test was set forth by the bankruptcy court in a related case, *In re: Piper Aircraft Corp.,* 169 B.R. 766 (Bankr.S.D.Fla.1994). By changing the focal point of the relationship from the petition date to the confirmation date, the test now encompasses those with injuries occurring post-petition but pre-confirmation, consistent with the policies underlying the Bankruptcy Code.